No error.

---

MERCHANTS NATIONAL BANK v. DUNN OIL MILL COMPANY.

(Filed 13 December, 1912.)

**Corporations—Bills and Notes—President—Authority—Ultra Vires
—Consideration.**

> A bank desiring to borrow money from its correspondent bank hypothecated as collateral to its own note a note obtained from the president of a local oil mill corporation, signed with the name of the corporation by the president, without any consideration moving to the oil company being shown. The local bank being insolvent, the correspondent bank, as an innocent purchaser for value, sued the oil company on the collateral note, and the defense was the failure of consideration and lack of authority of the president to give the corporation's note. A motion to nonsuit was improperly sustained.

BROWN, J., did not sit and took no part in the decision; WALKER, J., concurred in the opinion of CLARK, C. J.; HOKE, J., dissented.

APPEAL from *Peebles, J.,* at April Term, 1911, of NEW HANOVER.

The facts are sufficiently stated in the opinion of the Court by *Mr. Chief Justice Clark.*

*E. K. Bryan and Rountree & Carr for plaintiff.*
*J. C. Clifford and N. A. Townsend for defendant.*

CLARK, C. J. The Merchants and Farmers Bank of Dunn executed its note to the plaintiff bank for $10,000 borrowed

money, and deposited as collateral security a note which had been executed to it for $10,000, signed "Dunn Oil Mills Company, by J. D. Barnes, President." This note was indorsed to the plaintiff before maturity by the Merchants and Farmers Bank of Dunn "by E. F. Young, President." The said Merchants and Farmers Bank of Dunn failed, and this action was brought against the said oil mills on its said note. The defendant oil mills pleads that it received no consideration for the same and that its president, J. D. Barnes, was not authorized to sign said note.

The defendant relied upon a provision in its by-laws: "All other contracts shall be in writing and signed by the president, or vice president, secretary and treasurer." The "secretary and treasurer" was one office. A fair construction of the by-law is that the writing should be signed by the president or vice president or secretary and treasurer. This note was signed by J. D. Barnes, president. His Honor erred, therefore, in his intimation that the note in question was not binding upon the Oil Mills Company.

But upon the broader question which was argued before us, whether, if the by-law meant to require the secretary and treasurer *and* the president to sign all contracts, the company would be bound by a note signed by its president, in the absence of proof that the plaintiff had notice of such by-law, we are of opinion that the Oil Mills Company is bound by the promissory note which was issued in ordinary course of dealing and signed by its president. Nothing is more common than for mercantile and negotiable paper to be signed by the president *or* secretary and treasurer of a corporation.

The well-settled rule of law is that where one of two innocent parties must suffer by the act of another, that one which has put it in the power of the wrongdoer to commit the act must bear the loss. *R. R. v. Barnes,* 104 N. C., 25. The Oil Mills Company elected J. D. Barnes its president and thus put it in his power, according to the usual custom, to sign notes. If he abused his trust, the loss must fall upon the company which selected him and put him in that situation. For its own protection the company passed the above by-law. If it intended

thereby to prescribe that its note should be signed by the secretary and treasurer as well as by its president or vice president, it was competent for it to make such regulation. But such regulation would not affect the plaintiff bank, which took the note for value and before maturity, without notice of such regulation and relying upon the usual custom that mercantile paper can be signed by the president or general manager of a corporation.

In *Davis v. Insurance Co.,* 134 N. C., 60, this Court said that the president was "the general representative of the company," and in *Grabbs v. Insurance Co.,* 125 N. C., 389, it said that the expression "general agent" implied general powers. It has also been held that a general agent can make contracts for the company. *Grabbs v. Insurance Co., supra; Gwaltney v. Assurance Society,* 132 N. C., 925; *Davis v. Insurance Co., supra.*

It is no defense against a holder for value without notice that the officer exceeded his authority. 7 Cyc., 625.

"Where a party deals with the corporation in good faith, the transaction is not *ultra vires,* and if he is unaware of any defect of authority or other irregularity on the part of those acting for the corporation, and there is nothing to excite suspicion of such defect or irregularity the corporation is bound by the contract, although such defect or irregularity in the authority exists." *Bank v. Bank,* 10 Wallace, 644.

"The *bona fide* holder for value of notes taken before maturity can recover against the corporation notwithstanding any want of authority of the agent to execute these notes for the purpose for which they were given." *Bird v. Daggert,* 97 Mass., 494.

The general rule that a person dealing with an agent must know the extent of his authority does not apply when dealing with one who is a general agent, as the president of a corporation. In such case the burden is upon the principal to show that the other party had notice of a restriction upon the power of the general agent. The promissory note of this corporation was not *ultra vires.* There is no prohibition in the law against such a corporation issuing its promissory negotiable note.

In *Hutchins v. Bank,* 128 N. C., 72, the Court held that a contract of guarantee by a bank cannot be avoided on the ground

of *ultra vires,* and held that even where a contract is *ultra vires* the corporation will be bound if the contract was within the general scope of its powers and has been wholly or partially executed. In that case this Court said, citing *Bank v. Bank,* 101 U. S., 183 : "It is to be presumed that the vice president had rightfully the power he assumed to exercise, and the defendant is estopped to deny it."

The president of a corporation has an implied power to indorse and transfer its negotiable paper. Indeed, in the case of National banks the president is authorized by statute to indorse the paper of the bank. Daniel Neg. Inst., sec. 394.

Unlike mining companies, as to which cases have been cited, and who buy very little except machinery, oil mills need considerable quantities of money for the purchase of cotton seed from time to time. Indeed, they have need to issue negotiable bills far more than banks, cotton factories, and railroads. It is a matter of common knowledge that they obtain this money by issuing promissory notes, usually to the banks, as in this case. Besides, the charter of the defendant authorizes it to buy cotton and cotton seed, to gin cotton, to manufacture cotton-seed oil, cotton-seed meal, to buy and sell cattle, hogs, and other stock, to manufacture ice, to buy and sell real estate and personal property, and, in addition, specifically authorizes the defendant "to borrow money in such amounts and at such times to carry on the business of this corporation as the proper officer may deem proper." There is also authority to manufacture, buy and sell fertilizers. These things certainly authorized the making of negotiable paper in the course of its business.

Though the defendant here pleaded that it received no consideration for this paper, this was not shown in evidence. The note sued on was strictly commercial and negotiable in form under our statute; the plaintiff, a bank in a distant town, is a purchaser for value in due course; the note was put in circulation through the agency of a bank in the town where the oil mills were located and with which the oil mills had dealings; it was put in circulation and signed by the oil mills through its chief officer. The purchaser in such case in due course, knowing the course of dealings by oil mills in getting money from the

banks, was not required to hunt up and read the by-laws of the oil mills before purchasing, especially since reference to the charter would have shown that the making of negotiable paper and the borrowing of money was within the scope of the powers of the defendant.

The true doctrine is stated in *Bank v. Bank,* 10 Wallace, 64: "That such acts of an officer of a corporation as are usually performed by that officer are valid as against the corporation in favor of innocent parties, although the act in the particular instance was beyond the authority of the officer." Banks do not usually issue promissory notes or borrow money, yet they are bound by the act of their cashiers in certifying checks falsely.

The plaintiff bank in Wilmington in taking this paper, indorsed by the Bank of Dunn, with which the oil mills at Dunn were in the habit of doing business, was not guilty of negligence in assuming that the paper was signed by the proper officer of the oil mills and was issued in the course of its ordinary dealings with its regular bank. There is nothing in this evidence to show that the oil mills did not obtain full value. At any rate, it was the act of the oil mills, acting through its chief officer, that the paper was put in circulation and the plaintiff bank took it in due course, for value and without notice, and as such is protected by the statute.

Our conclusion is that the president of the corporation being its general agent, the promissory note executed by him in its name was *prima facie* valid, and being indorsed to the plaintiff before maturity for value and without notice, the corporation is bound by the act of its president, unless it were shown that the plaintiff had notice of a restriction upon the powers of the president as such general agent.

In *Watson v. Manufacturing Co.,* 147 N. C., 475, this Court quoted with approval the following language from Thompson on Corporations, 8556: "A stranger dealing with the corporation is not affected by secret restrictions upon the powers of a general manager of which he has no notice. In short, the powers of one who has been appointed general manager of the business of the corporation are, in America, generally understood to be coextensive with the general scope of its business. . . . A person dealing with the corporation through him may

safely act on the assumption of his possessing the power in the absence of anything indicating a want of it."

In *Mershon v. Morris,* 148 N. C., 52, this Court approves the following language from Judge Thompson, 10 Cyc., 1003: "Excluding the operation of express statutes, a very extensive principle of the law of corporations, applicable to every kind of written contract executed ostensibly by a corporation, and to every kind of act done by its officers and agents professedly in its behalf, is that, when the officer or agent is the appropriate officer or agent to execute a contract or do an act of a particular kind in behalf of the corporation, the law presumes a precedent authorization, regularly and rightfully made, and it is not necessary to produce evidence of such authority from the records of the corporation: always provided that the corporation itself had the power under its charter or governing statute to execute the contract or to do the act."

The Oil Mills Company had authority to execute promissory notes. The president was *ex vi termini* its general agent. The plaintiff having taken a promissory note executed by the president of said oil mills, in regular course, before maturity, for value and without notice of any restriction upon the authority of the president to execute said note, the court below erred in holding that said note was not binding upon said Oil Mills Company. Any other ruling would materially affect dealings in negotiable paper executed by a corporation.

Error.

WALKER, J., concurs in opinion of CLARK, C. J.

ALLEN, J., concurring: I concur in the order directing a new trial. The question involved in this case is of the first importance, involving as it does, on the one hand, the integrity of paper claimed to be negotiable, and, on the other, the power of the industrial corporation in its by-laws to restrict the authority of its officer to issue paper, and I think it ought not to be decided until the facts are fully developed.

It is material to inquire whether the defendant received any benefit from the paper in controversy in money, the payment of debts, or as a credit, and whether its president habitually transacted business of this character.

The opinion of the *Chief Justice* proceeds largely upon the assumption that these facts do appear, but I do not think so.

HOKE, J., dissenting: I am unable to concur in the view which has prevailed with the Court in this case, and believing that the decision, in so far as indicated and controlled by the principal opinion, is subversive of established principles and well calculated to have far-reaching and injurious effect on the business interests of the State and its people, I consider it proper to make some statement of the reasons for my position. The portion of the by-laws of the defendant, the Dunn Oil Mills, relative to the president's duties and his power to make contracts for the company are as follows:

"ARTICLE 1. The president, with the approval of the secretary and treasurer, shall be empowered to employ a bookkeeper, at a salary to be fixed by the directors.

"ARTICLE 2. The president shall preside at all meetings and shall make annual report to the stockholders' meeting and shall attend to all other duties hereinafter imposed upon him by these by-laws.

"ARTICLE 3. The secretary and treasurer shall be elected by the directors for a term to be fixed by them. He shall at each semiannual meeting of the directors render an account current, showing the assets and liabilities of the company, and shall present his books and vouchers, showing receipts and disbursements of the corporation. He shall enter into a good bond of $25,000 in an acceptable guaranty company, for which the premiums shall be paid by this company.

"ARTICLE 4. The president, secretary and treasurer shall have the power to employ a superintendent, salary to be fixed by them, subject to the approval of the board of directors. All purchases incident to the operation of the work shall be made by the secretary and treasurer, but no purchase shall be made by him without the approval of the president. All other contracts shall be in writing and signed by the president or vice president, secretary and treasurer."

In my opinion, these by-laws by correct interpretation clearly require that in order to bind the corporation by a contract of this character, it must be executed by the president or vice presi-

dent and the secretary and treasurer, who, it will be noted, is the responsible officer of the company, acting under a heavy bond for the proper performance of official duty.

The president of the Dunn Oil Mill, then, had no authority to make the corporation's note, and the instrument sued on can only be enforced as an obligation of the company on the ground that the execution of the instrument is within the apparent scope of the president's power, or that the corporation had by its negligent conduct put him in a position that enabled him to perpetrate a fraud, and on the facts as they appear of record neither position can be correctly maintained. From these facts it appears 'that on 7 November, 1902, the president of the Dunn Bank, being in Wilmington, applied to the plaintiff bank for a loan of $10,000. The loan was made on the note of the Dunn Bank and with the understanding that collateral should be forwarded to secure the same. Later, on 11 December, 1902, the president of the Dunn Bank wrote inclosing collateral, among others the note sued on, purporting to be executed by the president alone, one J. D. Barnes. That the oil mill is a local industrial corporation engaged in the business indicated by its title, having a paid-up capital of $22,700. There are no facts in evidence tending to show that the president of the oil mill was accustomed to sign notes for the company or that he had ever signed one for any purpose except the note sued on, or that any such custom existed in corporations of this character, or that the company had ever acquiesced in or in any way ratified this or any other transaction of like kind. Nor is there testimony that the note was given for machinery or cotton seed or other material usual or necessary in the construction or operation of the plant. Nor is there any evidence tending to show that the oil mill needed this money or that it has ever received a dollar of it nor any benefit from it. The only evidence even offered on that subject was a statement in a letter of the president of the Dunn Bank to plaintiff, tending to show it was for the benefit of the mills, a declaration not made or sanctioned by the oil mill or its officers, and therefore excluded by the court. On these the controlling facts relevant to the inquiry, a decision based on the proposition that the president of this oil mill, an industrial enter-

prise, having a paid-up capital of only $22,700, may without authority and in contravention of its by-laws put in circulation a note for $10,000 binding as a negotiable instrument, is not grounded on right reason nor is it sustained by any well-considered authority. Even in the case of banks and officers charged officially with the duties of carrying on its ordinary business, the power to borrow money has been held not within the scope of their authority, real or apparent. *Bank v. Armstrong,* 152 U. S., 346; *Bank v. Bank,* 2 N. J., p. 257.

In the United States decision it was held: "The borrowing of money by a bank, though not illegal, is so much out of the course of ordinary and legitimate banking business as to require those making the loan to see to it that the officer or agent acting for the bank has special authority." And in the case of ordinary industrial corporations the decided cases and text-books of approved excellence are against the position of the Court on the facts as presented in the record. *Craft v. R. R.,* 160 Mass., 267; *R. R. v. Bank,* 62 Ark., 33; *Worthington v. R. R.,* 195 Pa. St., 211; *Edwards v. Carson Water Co.,* 21 Nev., 469; *Gould v. Gould,* 134 Mich., 565; *N. Y. Iron Mine v. Bank,* 39 Mich., 644; *Elwell v. R. R.,* 7 Washington, 487; *Bocark Ex. v. Coal and Iron Co.,* 82 Va., 913; *Bank v. Roman Catholic Church,* 109 N. Y., 512; Cook on Corporations (6 Ed.), secs. 716-719; Clark on Corporations, p. 495; 21 A. and E., p. 859.

To quote from a few of the cases: In *Iron Mine v. Bank, supra,* Cooley, J., said: "*It was not disputed* by the defense that the corporation as such had power to make the notes in suit. The question was whether it had in any manner delegated that power to Wetmore. We cannot agree with the plaintiff that the mere appointment of general agent confers any such power. *White v. Westport Cotton Mfg. Co.,* 1 Pick., 215, is not an authority for that position, nor is any other case to which our attention has been invited. In *McCullough v. Moss,* 5 Denio, 567, the subject received careful attention, and it was held that the president and secretary of a mining company, without being authorized by the board of directors to do so, could not bind the corporation by a note made in its name. *Murray v. East India Co.,* 5 B. and Ald., 204; *Benedict v. Lansing,* 5 Denio,

283, and *The Floyd Acceptances,* 7 Wall., 666, are authorities in support of the same view. The plaintiff, then, cannot rest its case on the implied authority of the general agent; the issuing of promissory notes is not a power necessarily incident to the conduct of the business of mining, and it is so susceptible of abuse to the injury and, indeed, to the utter destruction of a corporation, that it is wisely left by the law to be conferred or not as the prudence of the board of direction may determine."

In *Worthington's case, supra,* 195 Pa. St., it was held: "The by-laws of a corporation, upon their adoption, become written into the charter, and put parties, who deal with the corporation, upon notice, in trading with the officers of the corporation, as to the extent of the power and agency of such officer, and this, whether the specific by-law has been brought home to them or not."

"In an action against a corporation to hold it liable on an indorsement of a promissory note by its president, binding instructions should be given for defendant where it appears that the president had no authority under the by-laws to make the indorsement, that the corporation received no benefit from it, and that there was no course of dealing between the parties which misled the plaintiff."

In the Arkansas case the Court held, among other things: "(*a*) The president and secretary of a corporation are not empowered to bind it by their signatures to commercial paper unless such authority is expressly conferred. Such power is not to be presumed simply from the fact that it has been exercised. (*b*) A corporation is liable on negotiable paper issued by its president and secretary only when express power has been conferred upon them to issue it or when they have habitually issued it or when their act in issuing it has been valified by the corporation or when the latter has received the benefit by the transaction."

In Cook, sec. 717, the doctrine is stated as follows: "The president of a corporation has no power, by reason of his office alone, to buy, sell, or contract for the corporation, nor to control its property, funds, or management. His duty is merely to preside at meetings of the board of directors, and to perform only

such other duties as the by-laws or resolutions of the board of directors may expressly authorize. This is a rule established by the great weight of authority. The board of directors may of course expressly authorize the president to contract; or his authority to contract may arise from his having assumed and exercised that power in the past; or the corporation may ratify his contract or accept the benefits of it, and thereby be bound. But the general rule is that the president cannot act or contract for the corporation any more than any other director. This question has frequently been before the courts, and many decisions have been rendered in regard to it. A large number of the cases are given in the notes below."

And even when the president acts as general manager, this same author says, section 719: "The general manager of a corporation has no power to make and deliver the promissory note of the company nor to indorse the name of the company on commercial paper, except possibly in payment of debts," etc.

In no jurisdiction has the wholesome doctrine contended for been more clearly stated nor more fully fortified and sustained than with us, as evidenced in the case of *Bank v. Hay,* 143 N. C., 326. In that valuable opinion, *Associate Justice Walker* in apt and forceful language and with a wealth of authority sustains the propositions: "When one deals with an agent, it behooves him to ascertain correctly the scope and extent of his authority to contract for and in behalf of his alleged principal. The authority to draw, accept, or indorse bills, notes, and checks will not readily be implied as an incident to the express authority of an agent. It must ordinarily be conferred expressly, but it may be implied if the execution of the paper is a necessary incident to the business, that is, if the purpose of the agency cannot otherwise be accomplished."

It is no answer to this position to say "That when one of two innocent parties must suffer by the act of another, that one which has put it in the power of the wrongdoer to commit the act must bear the loss." This is to avoid the issue by begging the entire question. The very question involved here is whether the corporation has acted wrongfully, and whether by reason of the wrong the instrument sued on has become its obligation.

What has it done or neglected to do? It has elected a president and conferred upon him power to preside over the meetings, make annual reports, and, in conjunction with the secretary and treasurer, a bonded officer to the extent of $25,000, to make the valid and ordinary contracts incident to the business.

Under the law, the signing of commercial paper is not within the scope of his authority, real or apparent. The company has done nothing to recognize or ratify his conduct on this or any other occasion, nor has it received any benefit from his act. In such case it would not do to say that the mere electing him president put him in a position to wrong others. Speaking to this very question, in *Iron Mine v. Bank*, 39 Mich, *Judge Cooley* says: "While the principle invoked is a very just and proper one, it is one that must be applied with great circumspection and caution. Any person may be said to put another in position to commit a fraud when he confers upon him any authority which is susceptible of abuse to the detriment of others; but if the authority is one with which it is proper for one man to clothe another, negligence cannot be imputed to the mere act of giving it. Any one who entrusts to another his signature to a written instrument furnishes him with the means of perpetrating a fraud by an unauthorized alteration or other improper use of it. But if the instrument was a proper and customary instrument of business, and has been issued without fraudulent intent in a business transaction, there is no more reason for imposing upon the maker the consequences of a fraudulent use of it than there is for visiting them upon any third person. In other words, it is not the mere fact that one has been the means of enabling another to commit a fraud that shall make him justly chargeable with the other's misconduct; but there must be that in what he has done or abstained from doing that may fairly be held to charge him with neglect of duty."

The position of the Court is not strengthened by the fact that this corporation is given, in express terms, the right to borrow money. Very few, if any, industrial companies are without such power. Nor by assuming, entirely without supporting evidence, in the record or out of it, so far as the writer is aware,

that an oil mill is more accustomed to borrow money than any and every other kind of industrial corporation engaged in business; nor by the proposition advanced that this was commercial paper, put in circulation by the oil company and its agencies. It does not appear that the corporation has borrowed any money or that it has received any pecuniary benefit from the transaction, and the fundamental question is whether the note sued on was put in circulation through the oil company or its agencies, whether the paper in any way ever became the company's note; and here, also, to my mind, the Court assumes the very point in dispute. The cases cited and relied upon by the Court do not, in my view, support its position. In the insurance cases cited from this Court, *Davis v. Insurance Co.* and others, the decision proceeded on the theory that the officer was a general agent, representing the company, and the act in question was within the scope of his powers. In *Bank v. Bank,* 77 U. S. (10 Wall.), 604, the acts of a bank cashier, in pledging the bank's credit by certifying checks, were shown to be according to a custom generally prevalent with banks, and it was held that there was evidence from which it might be inferred that the custom prevailed at this particular bank and with its knowledge and assent. In *Oliver v. Bird,* 97 Mass., the agent was duly authorized to sign "all notes and business papers," and this was construed as justifying the position that an accommodation note was within the scope of his apparent authority. *Hutchins v. Bank,* 128 N. C., 72, the question was on the power of a banking corporation to act in the premises, and the authority of the officers to charge it or the methods by which they could do it was in no way presented. And the reference to Thompson on Corporations, secs. 85, 5-6, and 10 Cyc., 1003, as cited with approval in *Watson v. Manufacturing Co.,* 147 N. C., 475, and *Merchon v. Morris,* 148 N. C., 52, were on facts widely variant from these appearing in this record. In *Watson's case* the officer executing the note in question was president and treasurer as well as owner of nearly all the stock, was in absolute control of the corporation, its assets and purposes, and, further, there was ample evidence of ratification. *Africa v. Duluth Co.,* 82 Minn., 283, on similar facts, was to like purport. In

*Merchon's case* the president of a lumber company had given an order for a lot of machinery for use in the company's business, which was delivered under a contract that title should remain in the vendor till the purchase price was paid. The company having become insolvent, vendor claimed a lien under the contract, and the court very properly held that the company or the receiver having control of its assets could not keep the machinery and repudiate the obligation. But as far as I am able to interpret them, no authoritative decisions can be found that will uphold this note as a valid obligation of the defendant company on the facts of this case. There is nothing harsh or unreasonable in the position contended for. No well-ordered bank should place $10,000 with a company of this character or any other, without looking to the authority for the transaction. No well-ordered bank does do it, or, if they do, they should not be protected in it. It was very little to ask on the part of these injured stockholders that a bank within sixty miles of the company's placing should inform themselves on this vital question. A vast and increasing amount of business in this country is being undertaken and carried on through these smaller incorporated companies. They are contributing much to the business enterprise and welfare of every section of the State and afford one of the few opportunities remaining for small investors. A decision which ignores and breaks down the safeguards reasonably devised for their protection, affording opportunity for a faithless, inefficient, or gullible president to wreck his company and destroy its assets under the persuasive influence of some local bank president, sometimes a friend and always in a position to extend personal favors, is to be indeed deplored, and in my judgment has no sanction in good reason nor well-considered precedent.

I am of opinion that the order of nonsuit should be affirmed.